IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| CHRISTOPHER D. PARHAM | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.  3:14cv283 (DJN) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Christopher D. Parham ("Plaintiff") is forty-nine years old and previously worked as a

delivery distributor for a wine company.  On February 10, 2011, Plaintiff protectively filed for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the

Social Security Act ("Act"), alleging disability from degenerative disc disease of the cervical

spine with an original alleged onset date of October 1, 2010.  An Administrative Law Judge

("ALJ") held a hearing on September 27, 2012, during which Plaintiff amended his alleged onset

date to August 3, 2009.  The ALJ denied Plaintiff's claims by written decision on October 17,

2012.  The Appeals Council denied Plaintiff's request for review on February 21, 2014,

rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C.

§ 405(g).  Plaintiff challenges the ALJ's denial of benefits on the basis that the ALJ violated

Plaintiff's Fifth Amendment due process rights and failed to fully inquire into all matters at issue

during Plaintiff's hearing, that the ALJ erred in affording less than controlling weight to

Plaintiff's treating physician's opinion and some weight to one of the state agency physicians,

that the ALJ erred in assessing Plaintiff's credibility and that Plaintiff presented new evidence requiring remand. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 13) at 16-22.)

The matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(c)(1) on the parties' cross-motions for summary judgment.[1] For the reasons set forth below, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 12), GRANTS Defendant's Motion for Summary Judgment (ECF No. 16) and AFFIRMS the final decision of the Commissioner.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, medical history, state agency physician opinions, Plaintiff's testimony and vocational expert testimony are summarized below.

### A. Education and Work History

Plaintiff completed high school. (R. at 45, 205.) Plaintiff worked for thirteen years as a delivery driver for a wine distributor. (R. at 45-46, 197.) Plaintiff suffered an injury in 1999 and received worker's compensation benefits, but continued to work on light duty for the wine distributor. (R. at 47.) In March 2007, Plaintiff stopped working to undergo shoulder surgery as a result of his 1999 injury. (R. at 47.)

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth) and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

### B. Medical History[2]

On March 25, 1999, Plaintiff visited John W. Ayres, M.D. at West End Orthopedic for pain and discomfort in his right arm.  (R. at 597.)  A physical examination of his right arm and shoulder revealed no abnormalities, and x-rays of Plaintiff's cervical spine were normal.  (R. at 597.)  On March 31, 1999, Plaintiff returned to Dr. Ayres and stated that his pain was associated with duties that he performed at work, including frequently lifting heavy objects and frequently lifting over his head.  (R. at 599.)  Dr. Ayres assessed that Plaintiff's symptoms were consistent with upper shoulder and cervical strain, as well as irritation and possible impingement of the scalenes and brachial plexus.  (R. at 599.)

On August 9, 1999, Plaintiff visited Charles Bonner, M.D. at Physical Medicine Center. (R. at 473.)  Dr. Bonner conducted a physical examination and opined that Plaintiff suffered from a chronic sprain and strain of the right shoulder with shoulder-hand syndrome.  (R. at 473-74.)  Dr. Bonner also indicated that Plaintiff's report suggested that he had degenerative disc disease.  (R. at 474.)  Dr. Bonner prescribed Zoloft, Naprelan and Flexeril, and referred Plaintiff for physical therapy.  (R. at 474.)

On April 18, 2006, Plaintiff returned to Dr. Maragh and stated that his pain began on March 3, 1999, after he suffered a shoulder injury at work while lifting a case of wine.  (R. at 565.)  Plaintiff's injury was initially treated as a sprain.  (R. at 565.)  Plaintiff subsequently visited Dr. Ayres and Dr. Bonner for pain control, who referred Plaintiff to Dr. Young in 2004. (R. at 565.)  Dr. Young requested and examined an MRI of Plaintiff's shoulder, which revealed a shoulder joint abnormality that required surgery.  (R. at 565.)  On physical examination, Plaintiff demonstrated limited motion in his right shoulder and mild atrophy in his joints.  (R. at 566.)

---

[2]     Because Plaintiff's brief references records that pre-date Plaintiff's amended alleged onset date of August 3, 2009, the Court summarizes those records for background purposes.

Plaintiff also felt pain with abduction of his right shoulder above ninety degrees that increased with external rotation. (R. at 566.) Dr. Maragh recommended that Plaintiff continue with his light duties at work and diagnosed Plaintiff with right thoracic outlet syndrome ("TOS"),[3] but noted that the progression was minimal because Plaintiff had been limited to light duties at work. (R. at 566.) On September 26, 2006, Dr. Maragh re-examined Plaintiff and observed that Plaintiff had limited motion in his neck and right shoulder due to pain. (R. at 572.) Dr. Maragh opined that Plaintiff suffered from TOS as a result from his injury at work. (R. at 572.) Dr. Maragh noted that Plaintiff needed to have his "pain cycle broken" and recommended that Plaintiff undergo a Kenalog injection into the painful area. (R. at 572.)

On March 20, 2007, Dr. Young operated on Plaintiff's right shoulder and conducted arthroscopic subacromial decompression, debridement of the glenohumeral joint and distal clavicle excision. (R. at 578-79.) On November 27, 2007, Plaintiff visited Dr. Maragh for a follow-up appointment. (R. at 582.) Dr. Maragh noted that Dr. Young opined that Plaintiff's shoulder had improved and that Plaintiff should consider returning to an appropriate job level. (R. at 582.) Upon physical examination, Dr. Maragh observed that Plaintiff experienced tenderness over the scapula muscles, pectoralis and chest. (R. at 582.) Plaintiff described pain that radiated into his shoulder, through his lateral arm and into his hand when he elevated his arm to ninety degrees. (R. at 582.) Dr. Maragh opined that Plaintiff continued to suffer from TOS and rib arthralgias. (R. at 582.)

---

[3]     The Mayo Clinic has described TOS as occurring "when blood vessels or nerves in the space between [the] collarbone and [the] first rib (thoracic outlet) become compressed." *Diseases and Conditions: Thoracic outlet syndrome*, Mayo Clinic, http://www.mayoclinic.org/ diseases-conditions/thoracic-outlet-syndrome/basics/definition/con-20040509 (last visited April 2, 2015). "This can cause pain in [the] neck and numbness in [the] fingers." *Id.*

On April 23, 2008, Plaintiff visited Peyman Nazmi, M.D. at the Richmond Spine Interventions and Pain Center. (R. at 552-54.) Dr. Nazmi observed that Plaintiff's physical examination showed pain upon flexion of the right shoulder and some tenderness over the cervical paraspinal muscles on the right side upon deep palpation. (R. at 553.) During the evaluation, Plaintiff complained of some radicular and neuropathic-type pain in his right pectoral area, but did not complain of any significant pain in his right shoulder and he retained full range of motion in his shoulder. (R. at 553.) On July 25, 2008, Dr. Nazmi performed trigger-point injections into Plaintiff's right cervical and thoracic paraspinal and trapezius region. (R. at 560.) On August 22, 2008, Plaintiff reported that his pain level decreased from 10/10 to 6/10 with medication. (R. at 561.) Dr. Nazmi recommended that Plaintiff return to work. (R. at 562.)

On September 22, 2008, Plaintiff visited Dr. Young and complained of right parascapular pain, neck and rib pain, and tingling in his fingers. (R. at 286.) Dr. Young observed that Plaintiff did not exhibit signs of acute distress, he retained intact sensation to touch in his upper extremities, showed positive Adson's reaction on the right side and had a mildly positive Tinel's reaction in his right elbow and wrist. (R. at 286-87.) Dr. Young also opined that Plaintiff's incisional sites were well-healed and Plaintiff demonstrated good external rotation abduction power. (R. at 287.) Although Plaintiff complained generally about pain in his parascapular musculature, Plaintiff did not describe any particular pain in his shoulder itself and had no complaints regarding his acromioclavicular or sternoclavicular joints. (R. at 287.)

On October 13, 2008, Plaintiff visited Gregory Lockhart, M.D. at Thoracic Surgery, PLC. (R. at 449.) Dr. Lockhart's physical examination of Plaintiff revealed that Plaintiff had spasms in his posterior cervical trunk and parascapular spasms on his right side. (R. at 449.) Dr. Lockhart opined that Plaintiff suffered from TOS, but noted that Plaintiff needed to undergo an

MRI to determine if his cervical discs were compressed before Dr. Lockhart could determine what treatment would be appropriate. (R. at 449.)

On November 10, 2008, Michelle Kraut, M.D. at MRI of Richmond read Plaintiff's MRI. (R. at 288.) Dr. Kraut opined that Plaintiff had straightening of the cervical spine, likely the result of a muscle spasm, central canal stenosis and right neural foraminal narrowing at C4-C5 and bilateral narrowing at C3-C4. (R. at 288.)

On June 26, 2009, Plaintiff underwent an electrodiagnostic consultation with Katherine L. Dec, M.D. at CJW Sports Medicine. (R. at 291-92.) Plaintiff's examination did not reveal any findings to suggest that he suffered from right cervical radiculopathy, right lower trunk brachial plexopathy, neurogenic TOS or carpal tunnel syndrome. (R. at 292.) Dr. Dec concluded that the electrodiagnostic examination did not explain Plaintiff's symptoms and that his results were normal. (R. at 292.)

On July 1, 2009, Rich J. Placide, M.D. at West End Orthopedic Clinic reviewed Plaintiff's MRI. (R. at 293.) Dr. Placide determined that Plaintiff showed degenerative changes in his cervical spine. (R. at 293.) Plaintiff's x-ray also showed that he had large transverse processes at C7. (R. at 293.)

On August 3, 2009, Plaintiff visited Michael J. DePalma, M.D. at the VCU Spine Center. (R. at 307-09.) Dr. DePalma conducted a physical examination and observed that Plaintiff's peripheral joint range of motion was normal in the head, neck, trunk and all four limbs, but Plaintiff exhibited myofascial discomfort in his upper limbs and a mildly limited cervical range of motion. (R. at 308.) Dr. DePalma also reviewed Plaintiff's 2008 MRI and opined that Plaintiff's right upper limb pain most likely resulted from C6-C7 extrusion. (R. at 308.) Dr. DePalma instructed Plaintiff to obtain an updated MRI examination. (R. at 308-09, 359.) On

6

August 26, 2009, Plaintiff's MRI revealed cervical disc desiccation at C5-C6 and C6-C7, but showed no evidence of central canal or neural foraminal stenosis. (R. at 301.)

On April 21, 2010, Plaintiff reported that he used only over-the-counter medication for pain, including extra strength Tylenol and Advil. (R. at 311.) Dr. DePalma read Plaintiff's MRI and opined that Plaintiff suffered from cervical axial pain and bilateral upper limb pain. (R. at 312.) Dr. DePalma prescribed a Transcutaneous Electrical Nerve Stimulation ("TENS") unit, referred Plaintiff to physical therapy and recommended that Plaintiff receive a transforaminal epidural steroid injection. (R. at 312.) On August 20, 2010, Dr. DePalma again recommended that Plaintiff undergo a transforaminal epidural steroid injection in combination with his home exercise program and continued use of the TENS unit. (R. at 314.) Dr. DePalma noted that he encouraged Plaintiff to use the TENS unit on a more long-term basis, "to facilitate function and gainful employment." (R. at 314.)

On October 29, 2010, Plaintiff visited Thomas Saullo, M.D. at the VCU Spine Center. (R. at 339-41.) Dr. Saullo noted that Plaintiff underwent the transforaminal epidural steroid injection, but refused to continue with that course of treatment. (R. at 339-40.) Plaintiff exhibited normal range of motion in his joints, maintained a cervical range of motion within functional limits and his Spurling maneuver results and nerve root tension results were negative. (R. at 340.) Plaintiff stated that he did benefit from using his TENS unit. (R. at 341.) Dr. Saullo explained in detail that Plaintiff's best course of treatment would be to continue with the transforaminal epidural injections. (R. at 341.) After Plaintiff's first injection, he suffered rectal bleeding with his bowel movement and associated this as a negative side effect of the injection, but Dr. Saullo thoroughly explained that was highly unlikely to be a related symptom. (R. at 339-41.) Dr. Saullo and Plaintiff agreed to continue Plaintiff's pharmalogical pain management.

(R. at 341.) On March 4, 2011, Dr. Saullo reevaluated Plaintiff and noted that Plaintiff did not want to pursue any further interventional medical procedures or cervical discography. (R. at 344.) Dr. Saullo referred Plaintiff to a list of pain management physicians in the area. (R. at 344.)

On May 16, 2011, Dr. Bonner reevaluated Plaintiff. (R. at 325-33.) Plaintiff stated that he walked every other day for exercise, but complained that all activity caused him more pain. (R. at 330, 332.) Plaintiff noted that the only pain medications that he took were Tylenol and Advil, and that the TENS unit helped his pain. (R. at 332.) On examination, Dr. Bonner observed that Plaintiff showed tenderness to palpation along the musculature and the trapezius at the right shoulder and arm and over the T2 costochondral junction. (R. at 333.) However, Plaintiff retained normal strength in his upper extremities, his sensation remained intact, no obvious atrophy appeared in his upper extremities and he had a normal range of cervical motion. (R. at 333.) Dr. Bonner prescribed Savella and Pennsaid for pain. (R. at 332-33.) Dr. Bonner recommended that Plaintiff get out of bed every day and go for a walk once or twice per day. (R. at 333.) Dr. Bonner also suggested that Plaintiff begin another type of exercise program in addition to walking each day. (R. at 333.)

On June 2, 2011, Plaintiff complained that he experienced negative side effects from his prescribed medications, including stomach aches, headaches, dizziness and increased blood pressure. (R. at 380.) On July 12, 2011, Plaintiff informed Dr. Bonner that he applied to several light duty jobs, but had not yet been hired. (R. at 382.) After Plaintiff described his subjective complaints, Dr. Bonner opined that Plaintiff could not work and did not have any options for rehabilitation. (R. at 382.) In August 2011, Plaintiff continued to complain of pain with all activity, but did note that the TENS unit and heat helped the pain temporarily. (R. at 430.)

8

Plaintiff's examinations revealed that he had intact sensation, full range of motion in his extremities and demonstrated only a slightly limited grip strength and slightly reduced cervical rotation. (R. at 430.) The nurse practitioner noted that Plaintiff had trouble resolving worker's compensation issues to cover his medication during this time and that he had retained a lawyer to resolve these issues. (R. at 431.)

On October 6, 2011, Dr. Bonner observed that Plaintiff retained a full range of motion in his bilateral upper and lower extremities, intact sensation in all extremities, symmetrical reflexes and a bilateral grip strength of 4/5. (R. at 400.) Dr. Bonner ordered that Plaintiff undergo a cervical MRI and continue to use the TENS unit and further prescribed him Flexeril and Advil. (R. at 400.) Plaintiff's MRI revealed mild disc and facet degenerative change, mild broad based disc protrusion at C6-C7 and mild central canal stenosis with mild to moderate left neural foraminal stenosis. (R. at 392.) On November 1, 2011, Dr. Bonner reviewed Plaintiff's MRI and indicated that he suffered from disc desiccation and mild canal stenosis, but had no nerve or cord compression. (R. at 401.) Dr. Bonner opined that Plaintiff did not need surgical intervention. (R. at 401.) Dr. Bonner prescribed Tylenol 3 with Codeine for pain and a soft cervical collar for Plaintiff to wear at night. (R. at 401.)

On November 29, 2011, Dr. DePalma observed that Plaintiff had intact peripheral pulses throughout, intact peripheral joint range of motion, negative cervical root tension signs, negative upper motor neuron signs and 5/5 muscle strength. (R. at 394.) Dr. DePalma discussed treatment options with Plaintiff and recommended diagnostic medial branch blocks and medial branch radiofrequency neurotomy with discography. (R. at 394.)

On November 30, 2011, Plaintiff returned to Dr. Bonner and indicated that he did not experience constant pain. (R. at 404.) Plaintiff further noted that the soft cervical collar helped

9

significantly and that heat and his medications also provided him relief. (R. at 404.) Dr. Bonner prescribed Lorzone instead of Skelaxin, continued Tylenol 3 with Codeine and the use of the cervical collar. (R. at 404.) Dr. Bonner and Plaintiff thoroughly discussed pursuing facet injections, nerve ablation and discography treatments. (R. at 404.) Dr. Bonner encouraged Plaintiff to consider these treatments and believed that facet injections could minimize his pain. (R. at 404.) Dr. Bonner noted that Plaintiff stated that he was "anxious about the pain associated with these procedures." (R. at 404.)

On December 28, 2011, Plaintiff described his pain as 10/10, even with his medications. (R. at 405.) Dr. Bonner observed that Plaintiff appeared calm and cooperative with appropriate affect. (R. at 405.) Dr. Bonner's examinations showed that Plaintiff had a full range of motion in his bilateral upper and lower extremities, exhibited intact sensation and symmetrical reflexes and showed a mild increased tone in his bilateral trapezius and cervical paraspinals. (R. at 405.) Dr. Bonner continued Plaintiff's Tylenol 3 with Codeine and Lorzone prescriptions. (R. at 405.)

On January 25, 2012, Plaintiff revisited Dr. Young for examination. (R. at 395-97.) Dr. Young's examination showed that Plaintiff suffered only mild head motion limitation and retained normal motor strength and intact sensation. (R. at 396.) Dr. Young also reviewed Plaintiff's October 2011 cervical spine MRI and determined that the scan showed a mild disc protrusion that was more severe on the left than the right. (R. at 396.) Dr. Young noted that the disc protrusion was only mild or minimal and that no large rupture compressing the spinal cord existed, and there was no evidence of foraminal encroachment. (R. at 396.) Dr. Young found it noteworthy that Dr. DePalma recommended that Plaintiff pursue a discography, which had not been completed. (R. at 396.) Plaintiff declined any more injections because he found that they

were "very painful," but Dr. Young observed that Plaintiff only received one "real injection in the cervical spine." (R. at 396.) Dr. Young did not recommend surgery. (R. at 397.)

On February 29, 2012, Courtney Ash, Dr. Bonner's nurse practitioner, observed that Plaintiff retained full range of motion in his bilateral upper and lower extremities, exhibited intact sensation and strength in his bilateral extremities, and showed increased tone in his bilateral trapezius and cervical paraspinals, but remained guarded to bilateral cervical rotation and had tenderness with palpation of the C5 through C7 facet joints bilaterally. (R. at 411.) Plaintiff stopped taking Savella due to complaints of side effects. (R. at 412.) Ms. Ash discussed prescribing Cymbalta, but Plaintiff alleged that he had bad reactions to similar medications. (R. at 412.) Ms. Ash further suggested that Plaintiff attend massage and manual therapy and see psychologist for chronic pain counseling, but Plaintiff stated that he could not attend due to transportation issues. (R. at 412.)

On March 28, 2012, Ms. Ash observed reduced range of motion in Plaintiff's shoulders, but an increased tone along Plaintiff's bilateral trapezius ridge and posterior paracervical muscles. (R. at 418.) Plaintiff also indicated that Lidoderm patches, heat, the soft cervical collar and medications provided relief from pain. (R. at 418.) Ms. Ash encouraged Plaintiff to walk and continue to use the TENS unit. (R. at 418.) On June 22, 2012, Ms. Ash and Plaintiff discussed vocational counseling, but Plaintiff explained that he had previously attended but no jobs were available for him. (R. at 422.) Plaintiff described being frustrated with not being able to drive or return to lifting-type work. (R. at 422.) Ms. Ash again recommended massage therapy, but Plaintiff stated that he continued to have transportation issues. (R. at 422.) Ms. Ash further discussed facet injections, but Plaintiff expressed hesitancy and declined to pursue the procedure for fear of pain. (R. at 422.)

11

In May, June and August 2012, Plaintiff visited Joseph G. Lerla, M.D. at Charles City Medical Group, Inc. (R. at 690-92.) Dr. Lerla observed that Plaintiff had normal ambulation, motor strength and tone. (R. at 689, 691, 693.) Dr. Lerla opined that x-rays of Plaintiff's hands, lumbar spine and bilateral knees were normal. (R. at 691, 706-08.)

On July 23, 2012, Plaintiff visited Dr. Bonner and complained that his pain level that day reached 9/10, but Dr. Bonner observed that Plaintiff appeared calm and cooperative with appropriate affect. (R. at 424.) Dr. Bonner's examination revealed that Plaintiff had full range of motion in his upper and lower extremities, intact sensation, symmetrical reflexes and increased tone in his bilateral trapezius and cervical paraspinals. (R. at 424.) Dr. Bonner prescribed Fioricet, Duexis, Lidoderm and Valium. (R. at 424-26.)

On September 24, 2012, Dr. Bonner completed a medical source statement regarding Plaintiff's condition. (R. at 713-17.) Dr. Bonner noted that he treated Plaintiff for chronic pain and myofascial pain syndrome. (R. at 713.) Dr. Bonner opined that Plaintiff had been disabled since August 3, 2009, and was restricted from using his hands, arms and fingers for more than thirty minutes continuously, reaching for a maximum of five times per day for ten to fifteen minutes, looking up or down several times per day, bending or stooping more than occasionally and lifting from the floor more than a few times. (R. at 713-15.) Dr. Bonner further noted that Plaintiff could sit for two hours or less and stand or walk for three hours or less in an eight-hour work day. (R. at 716.) Dr. Bonner noted that Plaintiff could read for more than five to ten minutes per day, could view a screen for more than fifteen to thirty minutes and could handle stress for more than five to ten minutes. (R. at 714.) Dr. Bonner opined that during a typical day, Plaintiff's pain and discomfort were not severe enough to interfere with his attention and concentration necessary to perform even simple work-related tasks for seventy percent or more

of his waking hours. (R. at 716.) Additionally, Plaintiff could perform work that required fine manipulation with his fingers for more than two percent of an eight-hour work day. (R. at 717.)

C. State Agency Physicians

On May 3, 2011, Nancy Powell, M.D. conducted a medical examination of Plaintiff and reviewed his relevant medical history. (R. at 318-21.) Dr. Powell observed that Plaintiff walked from the waiting room to the examination room without difficulty and could change from supine to sitting position, take off his shoes and put them back on without difficulty. (R. at 320.) During the examination, Plaintiff walked with a normal gait, could execute finger-to-nose and heel-to-knee exercises, exhibited normal range of motion in his cervical spine, shoulders, elbows, wrists, hands, thoracolumbar, hips, knees and ankles. (R. at 320.) Dr. Powell noted that Plaintiff had no edema, spasm or crepitus. (R. at 321.) Plaintiff demonstrated a motor strength of 5/5 in all of his extremities. (R. at 321.) Although Plaintiff had 1/4 reflexes in each of his extremities, his sensory examination remained within normal limits. (R. at 321.) Dr. Powell opined that Plaintiff could stand or walk for six hours and sit without restrictions, could lift or carry fifty pounds occasionally and twenty-five pounds frequently with possible occasional climbing limitations due to neck and back pain, but had no manipulative or environmental limitations. (R. at 321.)

On May 10, 2011, Wyatt S. Beazley III, M.D. conducted a medical examination of Plaintiff and opined that Plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently, and could sit and stand or walk for more than six hours during an eight-hour workday. (R. at 85.) Dr. Beazley further noted that Plaintiff could climb ladders, ropes or scaffolds occasionally, but had no restrictions for climbing ramps or stairs, balancing, stooping,

kneeling, crouching or crawling. (R. at 85.) He assessed no manipulative, visual, communicative or environmental limitations. (R. at 86.)

On August 4, 2011, Josephine Cader, M.D. examined Plaintiff and opined that he did not have a severe impairment or combination of impairments that would significantly limit his physical or mental ability to do basic work activities. (R. at 102.) Dr. Cader determined that Plaintiff continued to ambulate with a normal gait and station and maintained 5/5 grip strength and strength in his extremities. (R. at 102.) Dr. Cader noted that Plaintiff exhibited some limitations in completing certain work activities, but these limitations did not preclude Plaintiff from performing his past relevant work. (R. at 104.)

D. Plaintiff's Testimony

On September 27, 2012, Plaintiff (represented by counsel) testified before the ALJ. (R. at 42-71.) Plaintiff testified that he was forty-seven years old and had completed the twelfth grade. (R. at 44-45.) Plaintiff admitted that he did not pursue treatment for his shoulder condition since his amended alleged onset date of August 3, 2009. (R. at 49.) Further, Plaintiff had not seen a neurologist for his headaches since 1999, despite being referred for an appointment by his treating physician. (R. at 54.) Instead, Plaintiff relied only on pain medication, including Tylenol 3 with Codeine, Ibuprofen 800, muscle relaxers and Flexeril. (R. at 49.) Plaintiff later testified that he did receive an injection for the pain in his neck, but that he could not tolerate the injection. (R. at 55.)

Plaintiff testified that he typically could get up on his own, dress, bathe and wash himself. (R. at 48.) He walked two blocks to and from the school bus stop with his nine-year-old son. (R. at 50-51, 53-54.) Plaintiff also indicated that after he walked the four blocks, he immediately needed to lie down due to pain, headaches and dizziness. (R. at 54.) Plaintiff stated that he

could wash dishes for approximately fifteen to thirty minutes and could cook or prepare meals using the toaster oven and microwave, but doing chores for longer than thirty minutes caused headaches and pain. (R. at 51.) Plaintiff noted that he did not do laundry or yard work. (R. at 51.) Plaintiff used the computer, but only for fifteen to thirty minutes due to pain in his fingers, arms and hands. (R. at 52.) He watched television, but only for approximately thirty minutes at a time. (R. at 61.) Plaintiff had a driver's license and usually drove once per week, unless he had a doctor's appointment. (R. at 52.) Plaintiff also stated that he accompanied his girlfriend to the grocery store and would walk around, pick out a few items and then return to the car. (R. at 52-53.) Plaintiff testified that he could lift ten pounds comfortably, but later stated that his pain increased when he lifted a five-pound dumbbell. (R. at 53, 55.)

Plaintiff stated that he previously worked as a delivery driver for a wine distributor, where he lifted over fifty pounds as part of his job. (R. at 45-46.) Plaintiff continued to work between 1999 and 2007 at his original job, but only performed light work. (R. at 56.) While on light duty, Plaintiff did not drive the truck, but remained in the warehouse and checked wine cases and picked up empty cardboard boxes. (R. at 56-57.) Plaintiff did not lift over twenty pounds when he worked light duty. (R. at 57.) Plaintiff later testified that he completed jury duty for which he used public transportation to get to the Richmond Circuit Court, and sat and fulfilled his jury duty. (R. at 65-66.)

E. Vocational Expert Testimony

During the hearing before the ALJ, an impartial vocational expert ("VE") testified. (R. at 66-68.) The ALJ asked the VE to describe Plaintiff's past work and exertional level. (R. at 67.) The VE noted that Plaintiff previously worked as a sales route driver that required a medium exertional level, but as described, Plaintiff's work required a heavy exertional level. (R. at 67.)

Plaintiff also previously worked as a warehouse checker that required light exertional level. (R. at 67.)  The ALJ asked the VE if the Plaintiff could still perform work if he experienced pain or a mental impairment of such a severity that he could not perform, concentrate or attend to basic job tasks. (R. at 67.)  The VE stated that he could not. (R. at 68.)  The ALJ stated to Plaintiff that if she found Dr. Bonner's questionnaire and the opinions of Plaintiff's treating physicians to be entirely credible, reliable and supported, then she would determine that there were no jobs existing in the national economy that Plaintiff could perform. (R. at 68.)

## II.    PROCEDURAL HISTORY

On February 10, 2011, Plaintiff protectively filed for DIB and SSI, alleging disability from degenerative disc disease of the cervical spine with an onset date of October 1, 2010. (R. at 171-83.)  Plaintiff's claims were denied both initially and upon reconsideration. (R. at 22-24, 116-18.)  On September 27, 2012, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 42-71.)  During the hearing, Plaintiff amended his alleged onset date to August 3, 2009. (R. at 45.)  The ALJ allowed the record to remain open for two weeks following the hearing for Plaintiff to submit additional evidence. (R. at 69.)  On October 17, 2012, the ALJ issued a written decision denying Plaintiff's request for benefits, concluding that Plaintiff was not disabled under the Act. (R. at 25-33.)  On February 21, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 3-5.)

16

### III.    QUESTIONS PRESENTED

1.  Did the ALJ violate Plaintiff's due process rights under the Fifth Amendment, 20 C.F.R. § 404.929 or HALLEX?

2.  Did the ALJ err in assigning limited weight to Plaintiff's treating physician's opinion and assigning some weight to the state agency physician?

3.  Did the ALJ err in assessing Plaintiff's credibility?

4.  Do Dr. DePalma's January 30, 2013 opinion and Dr. Bonner's January 31, 2013 letter constitute new evidence requiring remand?

### IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*,

667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which

significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R.

§ 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles

one to benefits under the Act, it must cause more than a minimal effect on one's ability to

function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is

expected to last, for twelve months or result in death, it constitutes a qualifying impairment and

the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or

equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must

determine whether the claimant can return to his past relevant work[4] based on an assessment of

the claimant's RFC[5] and the "physical and mental demands of work [the claimant] has done in

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits

will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the

analysis, such that he must prove that her limitations preclude him from performing his past

relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the

Commissioner at the fifth step to show that, considering the claimant's age, education, work

---

[4]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for
an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[5]     RFC is defined as "an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis. A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a regular and continuing basis
(*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum
amount of each work-related activity the individual can perform based on the evidence available
in the case record. *Id.* (footnote omitted).

experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## V.    ANALYSIS

A. The ALJ's Decision.

On September 27, 2012, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 42-71.) On October 17, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled under the Act. (R. at 25-33.)

At step one, the ALJ determined that Plaintiff had not engaged in SGA since his amended alleged onset date. (R. at 27.) At step two, the ALJ found that Plaintiff had the severe impairment of degenerative disc disease of the cervical spine. (R. at 27.) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.) At step three, after consideration of the entire record, the ALJ determined that

Plaintiff maintained the RFC to perform a full range of light work. (R. at 28-32.) At step four, the ALJ determined that Plaintiff could perform his past relevant work as a warehouse checker. (R. at 32.) Accordingly, because Plaintiff could perform his past relevant work, the ALJ found that Plaintiff was not disabled under the Act. (R. at 33.) The ALJ further noted that even if Plaintiff were restricted to sedentary work, he would still be found not disabled under the Medical-Vocational Guidelines based on his age, education and work history. (R. at 33.)

Plaintiff now challenges the ALJ's decision on several grounds. First, Plaintiff argues that the ALJ erred by violating Plaintiff's Fifth Amendment due process rights and HALLEX procedures, and failed to fully inquire into all matters at issue during Plaintiff's hearing. (Pl.'s Mem. at 16-18; Pl.'s Reply Br. ("Pl.'s Reply") (ECF No. 19) at 8-10.) Second, Plaintiff argues that the ALJ erred in affording little weight to the opinion of Dr. Bonner and some weight to Dr. Powell's opinion, one of the state agency physicians. (Pl.'s Mem. at 18-20.) Third, Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. (Pl.'s Mem. at 16-18; Pl.'s Reply at 10-12.) Fourth, Plaintiff argues that Dr. DePalma's January 30, 2013 opinion and Dr. Bonner's January 31, 2013 letter constituted new evidence that required remand. (Pl.'s Mem. at 20-22.)

Defendant responds with several arguments. First, Defendant argues that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Brief in Supp. Thereof ("Def.'s Mem.") (ECF No. 16) at 17-27.) Second, Defendant asserts that Plaintiff received a full and fair administrative proceeding that did not violate his due process rights under the Fifth Amendment of the United States Constitution. (Def.'s Mem. at 17-22.) Third, Defendant argues that the ALJ properly considered all medical opinions. (Def.'s Mem. at 22-25.) Fourth, Defendant contends that Dr. DePalma's opinion and Dr. Bonner's letter do not constitute new evidence requiring remand. (Def.'s Mem. at 25-27.)

B. Plaintiff received a full and fair hearing and the ALJ did not violate Plaintiff's procedural due process rights, 20 C.F.R. § 404.929 or HALLEX procedures I-2-6-60 or I-2-6-1.

Plaintiff argues that the ALJ denied Plaintiff procedural due process rights when she limited Plaintiff's testimony and failed to fully inquire into all relevant issues at the hearing in violation of Plaintiff's Fifth Amendment rights, 20 C.F.R. § 404.929 and the Hearings, Appeals and Litigation Law Manual ("HALLEX")[6] I-2-6-60[7] and I-2-6-1.[8]  (Pl.'s Mem. at 16-18; Pl.'s Reply at 8-10.)  Defendant contends that Plaintiff received a full and fair administrative proceeding under the Fifth Amendment of the Constitution and in compliance with 20 C.F.R. § 404.929, HALLEX I-2-6-60 and HALLEX I-2-6-1.  (Def.'s Mem. at 17-21.)

Under the applicable regulations and case law, "[t]he hearing examiner shall inquire fully into the matters at issue and shall receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters."  20 C.F.R. § 404.927; *Richardson v. Perales*, 402 U.S. 389, 400 (1971).  The regulations state that the hearing examiner has discretion over hearing procedures and that the hearing must be "of such nature as to afford the parties a reasonable opportunity for a fair hearing."  20 C.F.R. § 404.927; *Richardson*, 402 U.S. at 400.  When a claimant complains that a hearing conducted by an ALJ was not full and fair, the reviewing court should be "guided by whether the record reveals evidence gaps that result in

---

[6]  The HALLEX Manual conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff.  HALLEX includes policy statements and provides guidance for processing and adjudicating claims.  *See* HALLEX § I-1-0-1.  HALLEX is available online at:  http://www.ssa.gov/OP_Home/hallex.

[7]  HALLEX I-2-6-60 provides in pertinent part that "[t]he claimant and the representative have the right to question witnesses.  A claimant or representative is entitled to conduct such questioning as may be needed to inquire fully into the matters at issue."

[8]  HALLEX I-2-6-1 provides in pertinent part that, "[t]he ALJ must inquire fully into all matters at issue and conduct the administrative hearing in a fair and impartial manner."

22

unfairness or clear prejudice." *Jones v. Astrue*, 2010 WL 4825206, at *11 (D. Md. Nov. 29, 2010) (quoting *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997)).

Although the ALJ must consider the record as a whole, there is no duty to further develop the record. The ALJ must inquire into issues necessary for adequate development of the record, but "the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While the ALJ must make a reasonable inquiry into a claim of disability, the ALJ has no duty to "go to inordinate lengths to develop a claimant's case." *Thompson v. Califano*, 556 F.2d 616, 618 (1st Cir. 1977). The Fourth Circuit has explained that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when the evidence is inadequate" for the purpose of determining whether the claimant is disabled. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). But, an ALJ has adequately developed the record at the administrative hearing where the ALJ heard testimony from the claimant, heard testimony from a VE regarding the claimant's prior work tasks, allowed claimant's counsel to ask follow-up questions to elicit further details of the claimant's work history, and where the alleged deficiencies in the development of the record were not prejudicial to the claimant and did not prevent him from receiving a fair hearing. *Smith v. Sullivan*, 896 F.2d 547, 548 (4th Cir. 1990); *see also Farnsworth v. Astrue*, 604 F. Supp. 2d 828, 384 (N.D. W. Va. 2009) (concluding that ALJ had adequately developed record on which to determine whether claimant was disabled, including medical evidence and evidence of claimant's lifestyle activities).

1. The ALJ did not violate Plaintiff's procedural due process rights under the Fifth Amendment of the Constitution.

Plaintiff contends that the ALJ violated Plaintiff's due process rights under the Fifth Amendment of the Constitution by interrupting and limiting Plaintiff's testimony. (Pl.'s Mem. at 16-18.) Defendant responds that Plaintiff received a full and fair hearing and that the ALJ did not violate Plaintiff's Fifth Amendment rights. (Def.'s Mem. at 17-21.)

Due process is not a "technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). A plaintiff does not have an absolute right to present unlimited evidence; he is subject to the due process concept of reasonableness. *Liu v. U.S. Dep't of Justice*, 13 F.3d 1175, 1177 (8th Cir. 1994). Reasonable limitations include limiting the extent of the evidence presented or interrupting testimony to focus the proceedings and exclude irrelevant evidence. *See Aguilar-Solis v. I.N.S.*, 168 F.3d 565, 568 (1st Cir. 1999) (finding a fair trial even where Immigration Judge appeared impatient and interrupted plaintiff's testimony); *Iliev v. I.N.S.*, 127 F.3d 638, 643 (7th Cir. 1997) (determining that despite Immigration Judge's brusque demeanor, petitioner not deprived of fair trial based on lack of opportunity to present his case); *see also N.L.R.B. v. Midwestern Pers. Servs., Inc.*, 508, F.3d 418, 427 (7th Cir. 2007) (finding that ALJ did not unreasonably restrict cumulative testimony).

In the immigration context, an Immigration Judge ("IJ") who limited a plaintiff's testimony and frequently interrupted the plaintiff during the hearing did not run afoul of due process protections, because the interruptions served to focus the proceedings. *Kerciku v. I.N.S.*, 314 F.3d 913, 917-18 (7th Cir. 2003); *see also Kuciemba v. I.N.S.*, 92 F.3d 496, 501 (7th Cir.

24

1996) (concluding that transcript revealed that IJ's repeated interruptions served to focus hearing on relevant issues and did not prevent petitioner from fully presenting his claim). In the social security context, it is similarly appropriate for an ALJ to reasonably limit a plaintiff's testimony or evidence. *See Pate v. Astrue*, 2009 WL 4825206, at *9 (S.D. Tex. Dec. 8, 2009) (finding that any limits imposed by ALJ were reasonable and did not infringe on plaintiff's due process rights because record showed that counsel could question plaintiff and VE).

Further, reasonable limitations are permitted when the evidence presented becomes repetitive or cumulative. *Midwestern Pers. Servs., Inc.*, 508 F.3d at 427 (concluding that ALJ did not unreasonably restrict testimony that only repeated the findings submitted in report). The ALJ may limit duplicative or repetitive testimony that merely "echo[es] the findings" already in evidence. *Id.* Questions that elicit cumulative or repetitive answers may also be limited. *Pate*, 2009 WL 4825206, at *9 (finding that plaintiff's due process rights were not denied when ALJ "instructed counsel to 'move along' and later limited counsel to 'another two minutes'" after questioning became cumulative).

In this case, counsel was able to elicit testimony from Plaintiff and had the opportunity to question the VE. (R. at 54-68.) The ALJ limited Plaintiff's testimony only when it became duplicative and repetitious. (R. at 60, 62.) Specifically, the ALJ asked Plaintiff's attorney to finish questioning after Plaintiff already described his lifting capabilities and detailed a typical day of bathing, dressing, walking his son to the bus stop, laying down as a result of the pain and watching television or using the computer. (R. at 46, 48, 50-51, 53-54, 56-57, 59-62, 65-66.) The ALJ requested that Plaintiff's counsel wind down Plaintiff's testimony once it became repetitive and consisted of duplicative responses that were already well-established in the record, but nevertheless permitted him to ask a few additional questions. (R. at 60, 62.) Furthermore,

the ALJ held the record open for two weeks following the hearing to allow Plaintiff to submit additional evidence. (R. at 70.) Plaintiff fails to show that the ALJ's consideration of Plaintiff's impairments was impeded by his attorney's inability to question him at greater length.

Therefore, any limitations imposed by the ALJ were reasonable and did not violate Plaintiff's Fifth Amendment rights.

2. The ALJ did not violate 20 C.F.R. § 404.929.

Plaintiff argues that the ALJ violated the Social Security Administration's ("SSA") procedures under 20 C.F.R. § 404.929 by not providing Plaintiff with a full and fair hearing. (Pl.'s Mem. at 16-18.) Defendant contends that Plaintiff received a full and fair hearing. (Def.'s Mem. at 17-21.)

Regulations allow a claimant to "submit new evidence, examine the evidence used in making the determination or decision under review, and present and question witnesses." 20 C.F.R. § 404.929. As noted above, Plaintiff's counsel elicited testimony from both Plaintiff and the VE. (R. at 54-68.) Although the ALJ requested that Plaintiff's counsel finish his questioning, the ALJ nevertheless allowed him to ask additional questions. (R. at 60, 62.) Further, even after the hearing, the ALJ held the record open for two more weeks to allow Plaintiff to submit additional evidence. (R. at 70.)

Therefore, the ALJ provided Plaintiff with a full and fair hearing in accordance with 20 C.F.R. § 404.929.

3. The ALJ did not violate HALLEX I-2-6-60 or HALLEX I-2-6-1.

Next, Plaintiff argues that the ALJ denied Plaintiff a full and fair hearing by violating HALLEX I-2-6-60 and HALLEX I-2-6-1. (Pl.'s Mem. at 16-18.) Defendant responds that that the ALJ provided Plaintiff with a full and fair hearing. (Def.'s Mem. at 17-21.)

HALLEX provides guiding principles, procedural guidelines and information. *See* HALLEX I-1-0-1 ("Through HALLEX, the Associate Commissioner of Hearings and Appeals conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff.  HALLEX includes policy statements resulting from an Appeals Council *en banc* meeting under the authority of the Appeals Council Chair.  It also defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council and Civil Actions levels.").  It is well-established that interpretations contained in policy statements, agency manuals and enforcement guidelines lack the force of law. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000); *see also Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (holding that SSA internal manual is not a regulation and has no binding legal force).  HALLEX is an internal guidance tool and thus, lacks the force of law. *Melvin v. Astrue*, 602 F. Supp. 2d 694, 704 (E.D.N.C. 2009); *Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000); *see also Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir. 2003) (stating that HALLEX does not impose judicially enforceable duties).

HALLEX I-2-6-60 provides in pertinent part that "[t]he claimant and the representative have the right to question witnesses.  A claimant or representative is entitled to conduct such questioning as may be needed to inquire fully into the matters at issue."  As previously noted, counsel for Plaintiff questioned both Plaintiff and the VE at the hearing.  (R. at 54-68.)  Although the ALJ requested that Plaintiff's counsel finish questioning, the ALJ only did so once the testimony became duplicative and repetitive.  (R. at 46, 48, 50-51, 53-54, 56-57, 59-62, 65-66.)  Additionally, although the ALJ requested that counsel for Plaintiff finish his questioning, the ALJ nevertheless allowed counsel for Plaintiff to ask additional questions.  (R. at 60, 62.)  Here, the ALJ did not violate HALLEX I-2-6-60.

27

HALLEX I-2-6-1 provides in pertinent part that, "[t]he ALJ must inquire fully into all matters at issue and conduct the administrative hearing in a fair and impartial manner." In this case, the record contained sufficient evidence for the ALJ to make a disability determination. The ALJ's decision may be read as a whole. *Finley v. Astrue*, 2009 WL 2489264, at *10 (E.D.N.C. Aug. 13, 2009) (citing *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). Although Plaintiff argues that the ALJ failed to inquire into Plaintiff's potential TOS diagnosis, (R. at 449, 568-82), the ALJ accounted for all of Plaintiff's symptoms in her RFC assessment. (R. at 28-32.)

The ALJ considered Plaintiff's complaints of cervical spine, right upper arm and shoulder girdle pain. (R. at 30-32.) Specifically, Plaintiff's November 2008 MRI showed straightening of the cervical spine and right neural foraminal narrowing at C4-C5. (R. at 288.) On June 26, 2009, Plaintiff underwent an electrodiagnostic consultation that did not show that Plaintiff suffered from right cervical radiculopathy, right lower trunk brachial plexopathy, neurogenic TOS or carpal tunnel syndrome. (R. at 292.) Further, Dr. Dec determined that the electrodiagnostic examination did not explain Plaintiff's symptoms and opined that Plaintiff's results were normal. (R. at 292.)

On August 3, 2009, Dr. DePalma opined that Plaintiff demonstrated normal range of motion in his head, neck, trunk, arms and legs. (R. at 308.) Plaintiff's muscle stretch reflexes were 2+ and symmetrical with full muscle strength in both upper extremities. (R. at 308.) Plaintiff's cervical range of motion was only mildly restricted in extension due to discomfort. (R. at 308.) In April 2010, August 2010 and October 2010, Dr. DePalma opined that Plaintiff suffered from cervical axial pain and bilateral upper limb pain, but Plaintiff maintained a normal peripheral joint range of motion in his head, neck, trunk, arms and legs. (R. at 311-12, 314, 340.)

28

Further, manual muscle testing showed that Plaintiff retained full strength in both his upper and lower limbs, and his muscle stretch reflexes were 2+ and symmetrical. (R. at 311, 314, 340.) Plaintiff's cervical range of motion was only mildly restricted due to discomfort. (R. at 311, 314, 340.) In March 2011, Plaintiff retained normal peripheral range of motion, full muscle strength and mildly limited cervical range of motion. (R. at 343-44.) Plaintiff stated that he did not want to pursue any additional interventional treatments or cervical discography. (R. at 344.)

On May 16, 2011, Dr. Bonner observed that Plaintiff showed tenderness to palpation along the trapezius musculature, but Plaintiff had normal strength in his upper extremities, intact sensation, no apparent atrophy in his upper extremities and normal range of cervical motion. (R. at 333.) In November 2011, Dr. Bonner opined that Plaintiff suffered from mild canal stenosis and disc desiccation, but showed no nerve or cord compression. (R. at 401.) Dr. DePalma also observed that Plaintiff had intact peripheral pulses and joint range of motion, negative cervical root tension, negative upper motor neuron signs and full muscle strength. (R. at 394.) In January 2012, Dr. Young observed that Plaintiff exhibited mild head motion limitation, but retained normal motor strength and intact sensation. (R. at 396.) Further, Dr. Young determined that Plaintiff showed only minimal disc protrusion and no large rupture or foraminal encroachment existed. (R. at 396.)

Lastly, Plaintiff's assertion that the ALJ did not consider Dr. Bonner's office notes after September 8, 2011 is without merit. The ALJ specifically referred to MRI images from October 2011 that were ordered and reviewed by Dr. Bonner. (R. at 391-92.) Additionally, the ALJ incorporated Dr. Bonner's March 2012 medical notes and prescriptions for Plaintiff into his RFC assessment and noted that Dr. Bonner's treatment notes suggested that Plaintiff had degenerative disc disease. (R. at 31-32, 399-412, 414-27.) Lastly, the ALJ referenced Dr. Bonner's

September 25, 2012 questionnaire, but concluded that the severe restrictions assessed were extreme and inconsistent with objective medical evidence, including Dr. Bonner's own clinical findings that showed that Plaintiff exhibited intact sensation, normal reflexes, normal neurological examinations and that Plaintiff did not require surgery. (R. at 32, 712-717.)

Therefore, the ALJ did not violate HALLEX I-2-6-60 or HALLEX I-2-6-1 and, accordingly, did not err.

C. Substantial evidence supports the ALJ's decisions in affording weight to certain medical opinions.

Plaintiff argues that the ALJ erred in affording little weight to the opinion of Plaintiff's treating physician, Dr. Bonner, and some weight to the opinion of Dr. Powell, one of the state agency physicians. (Pl.'s Mem. at 18-20; Pl.'s Reply at 10-15.) Defendant responds that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 22-25.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527, 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

30

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p. Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. 20 C.F.R. §§ 404.1527(a), 416.913(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d).[9]

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Further the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treating relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the

---

[9]     The regulations detail that "other sources" include medical sources who are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). The given examples are a non-exhaustive list.

authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

    1. The ALJ did not err by giving little weight to the opinion of Dr. Bonner.

    In this case, the ALJ gave no treating source controlling weight. (R. at 31-32.) The ALJ did not completely reject Dr. Bonner's opinion that Plaintiff had severe restrictions in his ability to function based on myofascial pain syndrome and headaches, but rather assigned it little weight on the basis that the extreme limitations expressed were inconsistent with Plaintiff's longitudinal medical record, specifically Plaintiff's conservative and routine course of treatment and the mild objective findings. (R. at 32.)

    Substantial evidence supports the ALJ's decision, because Plaintiff's limitations were inconsistent with Dr. Bonner's treatment notes. In May 2011, Plaintiff stated that he walked every other day for exercise, even though activity increased his pain. (R. at 330, 332.) Dr. Bonner noted that Plaintiff exhibited tenderness to palpation along his right trapezius, but that Plaintiff retained normal strength, sensation and range of motion in his upper extremities. (R. at 333.) Plaintiff also told Dr. Bonner that the TENS unit helped his pain. (R. at 332.) Dr. Bonner recommended that Plaintiff increase his activity and suggested that Plaintiff begin another type of exercise program in addition to walking every day. (R. at 333.)

    On July 12, 2011, Plaintiff and Dr. Bonner discussed Plaintiff's job prospects, and the fact that Plaintiff had applied to several light duty jobs, but had not yet been hired. (R. at 382.) In August 2011, Plaintiff stated that the TENS unit helped his pain and, on examination, he exhibited intact sensation, full range of motion in his extremities with only a slightly limited grip

and reduced cervical rotation. (R. at 431.) On October 6, 2011, Dr. Bonner noted that Plaintiff demonstrated a full range of motion in his upper and lower extremities, intact sensation in all extremities and normal reflexes with a bilateral grip strength of 4/5. (R. at 400.) Dr. Bonner also reviewed Plaintiff's MRI images and noted that he observed only mild canal stenosis and disc desiccation, but no nerve or cord compression. (R. at 401.) On November 30, 2011, Plaintiff reported to Dr. Bonner that he was not in constant pain and that the soft cervical collar helped to relieve pain. (R. at 404.) Plaintiff stated that his medications and heat provided pain relief. (R. at 404.) Dr. Bonner further encouraged Plaintiff to consider undergoing procedures that could treat the conditions that caused Plaintiff's pain, including facet injections, nerve ablation and discography treatments. (R. at 404.) Dr. Bonner noted that Plaintiff felt anxious about the pain associated with these procedures and only wanted to treat his pain with medication. (R. at 404.)

In February 2012, Ms. Ash — Dr. Bonner's nurse practitioner — observed that Plaintiff had increased tone in his bilateral trapezius and paracervical muscles and a full range of motion in his bilateral upper and lower extremities. (R. at 411.) Ms. Ash discussed additional treatment options with Plaintiff, including massage or manual therapy and a psychologist for chronic pain counseling, but Plaintiff stated that he would not pursue these options due to transportation difficulties. (R. at 412, 418.) In March 2012, Plaintiff continued to show increased tone in his bilateral trapezius and paracervical muscles. (R. at 418.) Ms. Ash encouraged Plaintiff to continue walking and using the TENS unit. (R. at 418.) In June 2012, Ms. Ash and Plaintiff discussed vocational counseling to increase opportunities to find gainful employment, but Plaintiff stated that he previously attended and no jobs were available for him. (R. at 422.) Plaintiff once again refused to pursue massage therapy because of transportation issues or facet injections due to concerns about pain from the injections. (R. at 422.) In July 2012, Plaintiff

retained full range of motion in his bilateral upper and lower extremities, intact sensation, symmetrical reflexes, and increased tone in his bilateral trapezius and cervical paraspinal muscles. (R. at 424.) On September 24, 2012, Dr. Bonner completed a medical source statement and opined that Plaintiff had been disabled since August 3, 2009, but noted that, during a typical day, Plaintiff's pain and discomfort did not interfere with his ability to perform simple work-related tasks for seventy percent or more of his waking hours. (R. at 716.) Dr. Bonner also opined that Plaintiff's fine manipulation abilities in his fingers were not limited. (R. at 716.)

Additionally, other evidence in the record further supports the ALJ's decision to afford Dr. Bonner's opinion little weight. A July 1, 2009 x-ray showed minimal loss of disc height at C2-C3 and C3-C4 and twenty-five to fifty percent loss of disc height at C4-C5, C5-C6 and C6-C7, but revealed no cervical instability. (R. at 308.) An August 26, 2009 MRI demonstrated cervical disc desiccation at C5-C6 and C6-C7, but showed no evidence of neural foraminal stenosis. (R. at 301.) In August 2010, October 2010 and March 2011, manual muscle testing showed that Plaintiff retained full strength in his extremities, his muscle stretch reflexes were 2+ and symmetrical, his light touch sensation was intact and his cervical range of motion was, at most, mildly limited. (R. at 314, 339-41, 344.) An October 6, 2011 MRI showed mild disc and facet degenerative change and mild broad based disc protrusion at C6-C7 with mild central canal stenosis and mild to moderate left neural foraminal stenosis. (R. at 392.) Dr. Young noted that Plaintiff's MRI revealed only mild or minimal disc protrusion and that no large rupture compressing the spinal cord existed, nor was there evidence of any foraminal encroachment. (R. at 396.) On November 17, 2011, Dr. DePalma's examination of Plaintiff revealed that he had no pain to palpation over the lumbosacral, lumbar, thoracic or cervical spinous process and that Plaintiff's peripheral pulses and joint range of motion were intact. (R. at 393-94.) On January

34

25, 2012, Dr. Young noted that Plaintiff only had mild range of motion limitations in his head or neck. (R. at 396.) Further, neurological examinations showed normal strength and intact sensation. (R. at 396.)

Further, Plaintiff reported that he could get up, dress and wash himself without help. (R. at 48, 218.) Plaintiff also walked two blocks to the bus stop and back with his nine-year-old son. (R. at 50-51, 217, 221.) Plaintiff could prepare meals for himself using the toaster oven and microwave. (R. at 51, 217, 219.) Plaintiff could do some chores, including washing dishes. (R. at 51.) Plaintiff also reported that he would often watch television and read, use the computer and help his son complete his homework. (R. at 52, 217, 220.) Plaintiff also could occasionally shop in stores for food and snacks. (R. at 221.) Plaintiff remained capable of paying bills, counting change, handling a savings account and using a checkbook. (R. at 221.) Plaintiff noted that he could lift under ten pounds and walk a short distance. (R. at 222.) Plaintiff reported that he followed written and spoken instructions well, got along with authority figures well, and could handle stress and changes in his routine. (R. at 222-23.) Therefore, substantial evidence supports the ALJ's decision to afford Dr. Bonner's opinion little weight.

2.  The ALJ did not err in the weight afforded to Dr. Powell's opinion.

Plaintiff argues that the ALJ's decision to accept and give some weight to the opinion of Dr. Powell was unsupported by substantial evidence, because she was a non-treating physician. (Pl.'s Mem. at 19-20.) Defendant responds that the ALJ's decision to accept and afford some weight to the agency physician's opinion was supported by substantial evidence. (Def.'s Mem. at 25.)

State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).

Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as she would for any other medical opinion.  20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).  Except when a treating source's opinion is afforded controlling weight, the ALJ must "explain in the decision the weight given to the opinions of a [s]tate agency medical . . . consultant . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other examining sources."  20 C.F.R. §§ 404.1527(e)(ii), 416.927(e)(ii).

In this case, the ALJ did not afford a treating source controlling weight.  The ALJ acknowledged the expertise of the state agency physician in evaluating Social Security disability claims such as Plaintiff's and noted that Dr. Powell determined that Plaintiff was capable of performing medium and heavy exertional work.  (R. at 32.)  The ALJ stated that she considered Dr. Powell's assessment and gave it some weight in formulating her opinion, but that she incorporated additional restrictions beyond those assessed by Dr. Powell into Plaintiff's RFC assessment and found that Plaintiff was only capable of performing light work.  (R. at 32.)

Plaintiff's treatment records and imaging reports support the ALJ's determination. Plaintiff reported that heat, ice, pain medication and the TENS unit provided some pain relief. (R. at 332, 341, 431.)  Plaintiff regularly demonstrated full muscle strength on examination and frequently exhibited normal range of motion in his upper and lower extremities.  (R. at 333, 394, 396, 400, 411, 431.)  As noted above, MRI images showed mild disc and facet degeneration, only mild or minimal disc protrusion and no large rupture or foraminal encroachment compressing the spinal cord.  (R. at 392, 396.)

Plaintiff's own statements provide further support for the ALJ's decision.  Despite his physical problems, Plaintiff walked his son four blocks, to and from the bus stop, daily.  (R. at

50-51, 217, 221.)  Plaintiff also helped his son complete his homework, often watched television and read, and could shop in grocery stores for food.  (R. at 52, 217, 220-21.)  Thus, substantial evidence supports the ALJ's decision to afford some weight to Dr. Powell's opinion.

    D. The ALJ did not err in determining Plaintiff's credibility.

       Plaintiff argues that the ALJ erred in diminishing Plaintiff's credibility.  (Pl.'s Mem. at 16; Pl.'s Reply at 10-12.)  Defendant counters that substantial evidence supports the ALJ's credibility determination.  (Def.'s Mem. at 27.)

       After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1).  The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis.  *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a), 416.929(a).  The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms.  SSR 96-7p at 1-3.  The ALJ must consider all of the medical evidence in the record.  *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5 n.3; *see also* SSR 96-8p at 13 ("[The] RFC assessment must be based on all of the relevant medical evidence in the record.").  If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work.  *Craig*, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's

statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain alone do not provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms; however, after reviewing certain evidence, the ALJ ultimately diminished Plaintiff's credibility on the basis that his medical records showed only mild objective findings, his course of treatment was inconsistent with the severity of his alleged impairments and he only relied on a low-dose of narcotic medication to manage his pain.[10] (R. at 31.)

---

[10] At the outset, the ALJ stated that she diminished Plaintiff's credibility, because his claims as to the intensity, persistence and limiting effects of his impairments were not credible to the extent that they were inconsistent with the ALJ's RFC determination. (R. at 28-29.) The Fourth

Substantial evidence supports the ALJ's decision on the basis of Plaintiff's mild objective findings. A July 1, 2009 x-ray showed minimal loss of disc height at C2-C3 and C3-C4. (R. at 308.) On August 26, 2009, Plaintiff's MRI showed that he had cervical disc desiccation at C5-C6 and C6-C7, but showed no evidence of central canal or neural foraminal stenosis. (R. at 301.) In August 2010, October 2010 and March 2011, Plaintiff retained full strength in his extremities and his cervical range of motion was, at most, mildly limited. (R. at 314, 339-41, 344.) In October 2011, Plaintiff's medical examinations and images showed only mild disc and facet degenerative change, mild broad based disc protrusion at C6-C7 and mild central canal stenosis with mild to moderate left neural foraminal stenosis. (R. at 392, 396.) Dr. Young observed that Plaintiff suffered no large rupture or foraminal encroachment. (R. at 396.) On November 1, 2011, Dr. Bonner also opined that Plaintiff suffered from disc desiccation and mild canal stenosis, but showed no nerve or cord compression. (R. at 401.)

Further, Plaintiff pursued a conservative course of treatment. Plaintiff received just one transforaminal epidural injection into his cervical spine. (R. at 341, 396.) On several occasions, Dr. Young, Dr. Saullo, Dr. Bonner and Ms. Ash recommended that Plaintiff pursue additional injections, therapy, nerve ablation or discography treatments. (R. at 314, 339-41, 396, 404, 422.) Plaintiff repeatedly refused additional treatments and reported concerns about pain associated with facet injections and transportation issues in attending therapy appointments. (R. at 396, 404, 412, 418, 422.) Plaintiff also testified and discussed with doctors that he relied primarily on

---

Circuit recently held that using this "boilerplate" rationale — standing alone — is legal error. *Mascio v. Colvin*, __ F.3d __ , 2015 WL 1219530, at *6 (4th Cir. Mar. 18, 2015). The Fourth Circuit indicated, however, that this error may be harmless when the ALJ properly analyzes credibility elsewhere. *Id.* Here, the ALJ based her ultimate credibility assessment on Plaintiff's mild objective findings, conservative course of treatment and medication use. (R. at 31.) Accordingly, the Court finds that use of this "boilerplate" rationale constitutes harmless error. *See Mascio*, 2015 WL 1219530, at *6.

over-the-counter medications to treat his pain, including extra strength Tylenol and Advil. (R. at 49, 311, 332.)

Therefore, substantial evidence supports the ALJ's credibility determination.

E.  Dr. DePalma's January 30, 2013 opinion and Dr. Bonner's January 31, 2013 letter do not constitute new evidence requiring remand.

In support of his argument that the ALJ erred in assessing Dr. DePalma's and Dr. Bonner's opinions, Plaintiff cites to a January 30, 2013 opinion from Dr. DePalma and a January 31, 2013 letter from Dr. Bonner indicating that Plaintiff was disabled and argues that they constitute new and material evidence. (P.'s Mem. at 20-22; Pl.'s Reply at 15-17.) Dr. DePalma's assessment and Dr. Bonner's letter were not before the ALJ, but were available to the Appeals Council. (R. at 759-61, 763-68.) Defendant argues that the assessment and letter do not constitute new, material evidence warranting remand. (Def.'s Mem. at 25-27.) Although Plaintiff does not specifically argue that the Appeals Council should have reversed the ALJ in light of Dr. DePalma's assessment and Dr. Bonner's letter, Plaintiff uses the opinions in support of his argument that the ALJ erred in assessing Dr. DePalma's and Dr. Bonner's opinions. Therefore, the Court will discuss whether this new evidence warrants a remand.

In determining whether the ALJ's decision was supported by substantial evidence, a district court may not consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714-15 (1963)); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing *Vitek v. Finch*, 483 F.2d 1157 (4th Cir. 1970)) (noting that reviewing courts are restricted to the administrative record in determining whether the decision is supported by substantial evidence). Although the Court may not consider evidence that was not presented to the ALJ, the Act provides that the Court may remand a case for reconsideration in two situations.  42 U.S.C.

40

§ 405(g). The first is a "sentence four" remand, which provides that the "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing." *Id.* The second is a "sentence six" remand, which provides that the reviewing court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

A reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time that the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985). Because Plaintiff has offered new evidence to the Court, the Court will address whether Plaintiff has fulfilled the requirements to justify a sentence six remand.

    1.  Dr. DePalma's January 30, 2013 Assessment.

Dr. DePalma's assessment satisfies the third and fourth prong of *Borders*. Good cause for Plaintiff's failure to submit the assessment earlier exists because the January 30, 2013 opinion was completed after the ALJ issued her October 17, 2012 written opinion. (R. at 763-68.) Plaintiff made a general showing of the nature of the new evidence by entering the assessment into the record and discussing it in his motion. (Pl.'s Mem. at 20-22.) Plaintiff fails, however, to show that the new evidence is material and not merely cumulative. Evidence must

be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before the ALJ. *Borders*, 777 F.2d at 955-56 (citation and internal quotation marks omitted). Had the ALJ considered Dr. DePalma's evaluation, the Commissioner's decision would not have reasonably been different.

Dr. DePalma's January 30, 2013 assessment noted that Plaintiff carried a diagnosis of axial neck pain with facet joint arthropathy with stable and permanent symptoms. (R. at 763.) Dr. DePalma opined that Plaintiff suffered from chronic pain. (R. at 763.) Dr. DePalma indicated that Plaintiff did not have significant limitation of motion, but suffered frequent headache pain resulting from impairments of his cervical spine. (R. at 763-64.) Dr. DePalma described Plaintiff's previous course of treatment, including medications and an x-ray guided injection. (R. at 764.) Dr. DePalma opined that Plaintiff's symptoms would frequently interfere with his attention and concentration during an eight-hour workday, but noted that Plaintiff could tolerate low-stress jobs and was capable of performing low physical demand work with restrictions. (R. at 765.) Further, Dr. DePalma stated that Plaintiff could walk one to two city blocks without rest or severe pain, but could only sit or stand for approximately ten to fifteen minutes at a time and could sit for approximately less than two hours in an eight-hour workday. (R. at 765-66.) Dr. DePalma opined that Plaintiff needed a job that permitted shifting positions at will from sitting, standing or walking and that Plaintiff required the ability to occasionally take unscheduled breaks during an eight-hour workday. (R. at 766.) Plaintiff could rarely lift ten pounds, but could occasionally lift less than ten pounds, occasionally hold his head in a static position and occasionally crouch, squat or climb stairs. (R. at 766-67.)

Dr. DePalma's assessment is cumulative of Plaintiff's prior examinations. The assessment offers nothing more than a restatement of Dr. DePalma's previous medical records,

which the ALJ explicitly considered in coming to her decision. Accordingly, because the assessment provides no new information, Plaintiff fails to satisfy the first two *Borders* requirements. Therefore, the newly offered evidence fails to meet the requirements for remand.

2. Dr. Bonner's January 31, 2013 Letter.

Dr. Bonner's letter satisfies the third and fourth requirements of *Borders*. Good cause for Plaintiff's failure to submit the letter earlier exists because the January 31, 2013 letter was completed after the ALJ issued her October 17, 2012 written opinion. Plaintiff has also made a general showing of the nature of the new evidence by entering the letter in the record and discussing it in his motion. (Pl.'s Mem. at 20-22.) Plaintiff fails, however, to show that the new evidence is material and not merely cumulative. As discussed above, evidence must be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before the ALJ. *Borders*, 777 F.2d at 955-56 (citation and internal quotation marks omitted). Had the ALJ considered Dr. Bonner's letter, the Commissioner's decision would not reasonably have been different.

Dr. Bonner's letter merely reiterates and explains his previous findings regarding Plaintiff's symptoms. (R. at 759-61.) Dr. Bonner described the nature of diagnosing chronic pain in the medical community and noted that even persons who suffered pain for a period of less than twelve months could still suffer severe impairments. (R. at 759.) Further, Dr. Bonner stated that the ALJ conflated the level of impairment with the level of medication or treatment required because some individuals tolerate pain differently, thus, a more conservative course of treatment is a better option for some. (R. at 759-60.) Dr. Bonner opined that Plaintiff's activities were not inconsistent with the objective medical evidence because they require minimal exertion and are minimal compared to the exertional requirements of gainful employment. (R. at 760.)

43

Lastly, Dr. Bonner noted that although Plaintiff's MRI images may show mild or minimal impairments, such evidence may be inconsistent with Plaintiff's actual pain level because his injury may not be fully apparent on an MRI image.  (R. at 761.)  The letter offers nothing more than further explanation of Dr. Bonner's previous medical opinion and a critique of the ALJ's analysis.  (R. at 759-61.)

As noted above, the ALJ appropriately considered and weighed Dr. Bonner's opinion. The letter simply echoed substantive evidence already before the ALJ.  The determination of whether Plaintiff is disabled for the purposes of employment is one reserved for the Commissioner.  20 C.F.R. §§ 404.1527(d)(3)-(4), (e).  Accordingly, because the letter offers nothing more than a reiteration of Dr. Bonner's original assessment that was already before the ALJ and is supported by substantial evidence, Plaintiff fails to satisfy the first two *Borders* requirements.  Therefore, the newly offered evidence fails to meet the requirements for remand.

## VI.    CONCLUSION

Based on the foregoing analysis, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 12), GRANTS Defendant's Motion for Summary Judgment (ECF No. 16) and AFFIRMS the final decision of the Commissioner.

An appropriate order shall issue.

It is so ORDERED.

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: April 13, 2015